## West *v.* The Steamboat Berlin.

Where in an action against a steamboat, for damages for the non-performance of a contract for the transportation of freight from Dubuque to St. Paul, the defendant offered as a witness, the master of the boat, who, being sworn on his *voire dire*, testified as follows: "I was captain and part owner at the time when the contract with the plaintiff was entered into. I have no interest in the present suit. I sold out before the present suit was instituted, and before it was thought of. Nothing was said about any claim on the part of the plaintiff, when I sold. It was not known then, that he intended any proceedings;" and was permitted to testify in chief, against the objection of the plaintiff; and where there was no evidence, showing who appeared as owners of the boat, or to whom the witness sold his interest in the boat, or upon what terms; *Held,* That the witness was properly admitted to testify.

All contracts are to be construed with reference to their nature and subject matter, and to the contingencies to which they are subject.

Where in an action against a steamboat, for the non-performance of a contract to transport certain pork from Dubuque to St. Paul, which contract was evidenced by five bills of lading, signed by the captain, all of which contained the words, "shipped in good order and condition," and the usual reservation of "unavoidable dangers of the river and fire, only excepted," and one of which contained the additional clause: "with the usual privileges," the petition alleged that the goods were not taken to their destination, but were stored and left at Reed's Landing, some eighty or ninety miles from St. Paul; and where the owners of the boat appeared and answered, that the pork was unmerchantable, and that the plaintiff sustained no loss by reason of the delay or otherwise; that at the time of the shipment at Dubuque, the plaintiff well knew, that the season for navigation from Dubuque to St. Paul had passed, and that the regular boats in said trade had withdrawn by reason of the lateness of the season, and the extra hazard of frost, ice, and severe weather, whereby the navigation was liable to be closed at any day; that the steamboat Berlin was a small boat, of limited capacity, not calculated by size or form for speed, and ran by daylight only, all of which was known to plaintiff; that the plaintiff, being desirous of sending a quantity of pork and flour to St. Paul, and other points, applied to the captain, to undertake the trip from Dubuque to St. Paul, and in order to induce him thereto, agreed with the captain, that if at any point on such trip, the farther navigation of the river should be found impracticable, by reason of the cold or stormy weather, or if the said captain should judge it unsafe and hazardous to proceed farther, then he might store said pork and flour, and return; that the captain, relying upon such contract, agreed to make the trip; that the plaintiff knew the goods were shipped on an open flat boat, to be towed by the steamboat, as well as on the steamboat; that at the time of making the bills of lading, the plaintiff falsely represented to said captain, that the said spe-

cial privileges stated in the agreement, were specially named and written in the bills of lading; that said captain, relying upon such pretences and representations, signed the same, without any explanation; that the boat with all due diligence, according to her capacity and custom, proceeded on her voyage; that the increasing severity of the weather, and the high winds then prevailing, hindered and delayed the boat, so that on arriving at Reed's Landing, near the foot of Lake Pepin, the farther prosecution of the trip became impracticable, and said captain determined that he could proceed no farther with an open flat boat, heavily laden in tow; that there being no means of forwarding the goods, they were stored until they could proceed at the opening of navigation in the Spring.; that in February, 1854, the plaintiff took possession of the pork, so stored, and forbade the defendant having any farther power or control over the same, and so discharged defendant from any farther obligation under the contract; which answer also claimed pay for the freight, *pro rata*, and the new matter in which was denied by the replication; and where it appeared from the evidence, that pork was worth from $16 to $18, at Reed's Landing, and $20 at St. Paul; that the boat had a barge or a flat in tow, on which the freight was conveyed in part or wholly; that there was but one engineer and but one pilot, and he a *raft* pilot only, and not acquainted with the river above Lake Pepin; that the boat could run by daylight only, for some reason pertaining to herself, and not to the weather or the river; and that the freight agreed on was $1.50 per barrel; and where the captain of the boat testified as follows: "We (plaintiff and captain) both thought it might very likely happen, that the Berlin would not be able to reach St. Paul.  Plaintiff said, 'if you can't get through, you can get part through.'  When the boat started, plaintiff ran to the river bank, and said, 'if you can't get through, try and get to Charley Reed's, and deliver the goods there—he is the best man.'"  And where the court instructed the jury as follows: "Although it is a general principle, that a written contract cannot be varied by parol evidence of instructions given before, or at the time the contract is executed, because all the terms of the agreement are supposed to be expressed and fixed by the instrument; yet you may take into consideration the instruction of the plaintiff to the captain, to store the goods at Reed's Landing, in the event he should be unable to go farther, for this is not a variation or contradiction of the written contract.  I say, that so far as it would go to show, that the defendant was entitled to store the goods, if it was impossible for the boat to proceed farther, because of the dangers of the river and the closing of navigation, it would not be a variation, but on the contrary, as rather supporting it, for the bill of lading excepts the unavoidable dangers of the river, and reserves the 'usual privileges,' which is admitted to be the privilege of storing, when, by reason of unavoidable danger from ice, the farther prosecution of the voyage is impracticable;" to which the plaintiff excepted.

*Held*, 1. That the danger of interruption of the navigation, entered into, and became a part of the contract.

2. That a boat taking freight in November, to carry from Dubuque to St. Paul,

is bound to transport it to that place; but it is not *necessarily* bound to convey it there during the *same season.*

3. That if the navigation becomes *impracticable,* in consequence of the cold, the storms, or the ice of the season, the boat is excused from *then* fulfilling the contract, either on the ground of the act of the Higher Power, or because of the nature of the contract, and the contingencies which may well come within the contemplation and foresight of the parties, or in view of the clause excepting the unavoidable dangers of the river.

4. That under one or the other of these views, the boat had a right to stop and turn about, *if the voyage became impracticable.*

5. That the declarations of the plaintiff, as proven by the captain, were not to be viewed as varying the contract, or changing the liability of the boat, but were to be regarded only as directions *with whom* to store the goods, if the boat was obliged to stop.

6. That the instruction contained nothing but what pertained to the contract. Where in such a case, the court instructed the jury as follows: "If at the time the goods were shipped, the plaintiff knew the character and capacity of the Berlin, and that it was necessary for her, in order to carry this freight, to tow in flat boats, and that she could run only in daylight, it would be your duty to consider that the contract was entered into by both parties, in reference to these things; and the plaintiff can only demand that the boat should make such speed as such a boat could reasonably make, and encounter only such obstacles and risks as she could encounter with safety. The question is not, what could a larger and better boat have done, but what could this boat have done, with due diligence? and this will refer, not only to the time when the goods were stored, but to any subsequent time during the season;" *Held,* That the instruction was erroneous, and should not have been given.

And where in such a case, the plaintiff requested the court to give the following instructions: "That it was the duty of defendant to have a boat, staunch, strong, and fit for the business of transporting freight from Dubuque to St. Paul, at the season of the year when the contract was entered into. 2. That it was the duty of the defendant, to have officers, engineers, and crew, sufficient in number and competency, to man the boat constantly, day and night," which instructions were refused; *Held,* That the instructions were improperly refused.

And where in such a case, the plaintiff asked the court to instruct the jury as follows: "That the good order in which the defendant admits by the bills of lading, the goods were received, refers only to the external condition, and not to the state of the pork itself, with reference to its soundness," which instruction was refused; *Held,* That the instruction should have been given.

### Appeal from the Dubuque District Court.

THIS is an action against a steamboat, instead of against the owners thereof, under the provisions of chapter 120 of the Code. The action is brought upon five bills of lading,

signed by the captain of the boat, for the transportation of two hundred and thirty barrels of mess pork, from Dubuque in Iowa, to St. Paul in Minnesota, and ten barrels of the same from Dubuque to Port Douglass. The bills of lading are in the usual form, containing the words: "Shipped in good order and condition, &c.," and the usual reservations of unavoidable dangers of the river and fire, only excepted. But *one* of them, which is for one hundred barrels, contained this additional clause, "with the usual privileges." The petition alleges, that the contract has been violated in this, that the goods were not taken to their destination, but were stored and left at Reed's Landing, which is some eighty or ninety miles below St. Paul. The plaintiff claims damage for this non-performance of the contract, and as items of damage, he sets up the loss sustained by not getting the pork to St. Paul; the loss of insurance; the trouble and expense of going to Reed's Landing, to look after and take care of the pork; the charges paid; the laying out of the use of the money; and the trouble and expense of shipping the pork from Reed's Landing to St. Paul.

The owners of the boat appear to the action, and in defence, answer: 1. That the pork was unmerchantable, and that the plaintiff sustained no loss by reason of delay or otherwise; 2. That at the time of the shipment at Dubuque, the plaintiff well knew that the season for navigation from Dubuque to St. Paul was passed, and that the regular boats in said trade had withdrawn, by reason of the lateness of the season, and the extra hazard of frost and ice, and severe weather, whereby the navigation was liable to be closed at any day; that the steamboat Berlin was a small boat of limited capacity, not calculated, by size and form for speed, and ran by daylight only; all of which was known to the plaintiff; that the plaintiff being desirous of sending a quantity of pork and flour to St. Paul, and other points, applied to John F. Noel, then in command of the boat, to undertake a trip from Dubuque to St. Paul; and in order to induce him thereto, the plaintiff agreed with said Noel, that if at any point in such trip, the further navigation of the

river should be found impracticable, by the reason of the cold or stormy weather, or if the said Noel should judge it unsafe and hazardous to proceed further, then he might store said pork and flour, and return; that said Noel, relying upon such contract, agreed to undertake the trip; that the plaintiff knew the goods were shipped upon an open flat boat, to be towed by the steamboat, as well as on the steamboat; that at the time of making the bills of lading, the plaintiff falsely represented to said Noel, that the said special privileges so as aforesaid stated in the agreement, were specially named and within the bills of lading, and said Noel relying upon such pretences and representations of the plaintiff, so falsely made, signed the same, without any explanation, whereby the plaintiff defrauded the defendant in procuring the said supposed bills of lading; that under the inducements aforesaid, the boat with all due diligence, according to her capacity and custom, well known to the plaintiff, proceeded on her voyage; that excessive severity of the weather, and the high winds then prevailing, hindered and delayed the boat, so that on arrival at Reed's Landing, near the foot of Lake Pepin, the farther prosecution of the trip became impracticable, and said Noel determined that he could proceed no farther, by reason of the extreme hazard of such late navigation, and the danger of ice and high winds in Lake Pepin, with an open flat boat, heavily laden, in tow, and that there being no means of forwarding the goods, they were stored until they could proceed, at the opening of navigation in the spring; and that in February, 1854, the plaintiff took possession of the pork, so stored, and forbade the defendant having any farther power or control over the same, and so discharged the defendant from any farther obligation under his contract. The owners then pleaded a set-off, claiming their freight money, *pro rata*. The freight agreed upon was one dollar and fifty cents per barrel. There was a reply. There was evidence tending to show that pork was worth from sixteen to eighteen dollars at Reed's Landing, and twenty dollars at St. Paul. There was also evidence, tending to show that the boat had a barge or a flat in tow,

on which her freight was conveyed, in part or wholly ; that there was but one engineer and but one pilot, and he a *raft pilot* only, and who was not acquainted with the river above Lake Pepin ; and that the boat could run by daylight only, for some reason pertaining to herself, and not to the weather or the river.   There were thirteen instructions given to the jury by the court, in its charge-in chief, and eight others were asked by the plaintiff.   They are too voluminous to set out in full in this statement ; but those to the giving or refusal of which exceptions are taken, will be shown in the opinion.   The jury found a verdict for the defendant, upon which judgment was rendered, and from which the plaintiff appeals to this court, where he assigns for error, the admission of the testimony of the captain of the boat, and the giving, and refusal to give, certain instructions.

*Wiltse & Blachley*, for the appellant.

*W. T. Barker*, for the appellee.

WOODWARD, J.—The first objection made in the case, which we will notice, is that made in the admission of the witness Noel.   He was master of the boat, and was part owner at the time of giving the bills of lading.   He was offered as a witness on the part of the defendant, and his competency was objected to, on account of interest.   Being examined on his *voire dire*, he testified as follows : " I was captain and part owner, at the time when, &c.   I have no interest in the present suit ; I sold out before the present suit was instituted, and before it was thought of ; nothing was said about any claim on the part of West, when I sold.   It was not known then, that he intended any proceedings."   It is not very manifest why this question is made in this court, for it is very slightly treated, and does not seem to be raised with much confidence.   So far as the examination of the witness only can go, it clearly exonerates him from liability, *unless* that liability is involved in the very sale itself, under the idea of an implied warranty against incumbrance of liability to past

claims. No argument or authority is offered on this question. It will not be pretended, that we should adjudge this question in such a destitution of facts relative to the sale. There is no *evidence* concerning it, except the above testimony of J. F. Noel, the master, who says: " Nothing was said about any claim on the part of West, when I sold." We cannot *guess* at the terms of the sale. If the plaintiff wished to make this question, he should have had evidence of the contract of sale. And further, the papers do not show who appeared as owners of the boat, (which they should), but the testimony is all before the court, under a motion for a new trial; and in looking at this, we find that J. F. Noel, the master, is brother of J. B. and Anthony Noel, who signed the bond for the release of the boat. Now, if we should assume that these are the owners, and who had been joint owners with J. B. Noel, and that he sold *to them*, it might raise the question whether selling to his former co-owners, he would be liable. It is apparent that we cannot settle the question in the absence of the proper facts, and that the plaintiff must rest upon his examination upon the *voire dire*, as unsatisfactory as it is. In this, therefore, there was no error.

The first error assigned, is the admission of the above witness. The second and third are based upon the giving the instructions numbered 11 and 12, which are here given in substance. The 11th is, that, "if you believe that the plaintiff, to induce the captain to undertake the trip, agreed with him, that if at any point in the trip, the further navigation of the river should be found impracticable, by reason of the cold or stormy weather, or the captain should judge it unsafe and hazardous to proceed further, then defendant might store the goods; and that Noel, relying upon this contract, undertook the trip and signed the bills, and proceeded until it became impracticable to proceed farther, then your verdict should be for the defendant." The twelfth is, " although it is a general principle, that a written contract cannot be varied by parol evidence of instructions given before or at the time the contract is executed, because all the

West v. The Steamboat Berlin.

terms of the agreement are supposed to be expressed and fixed by the instrument, yet you may take into consideration the instruction of the plaintiff to the captain, to store the goods at 'Reed's Landing,' in the event he should be unable to go farther; for this is not a variation or contradiction of the written contract.   I say that so far as it would go to show that the defendant was entitled to store the goods, if it was impossible for the boat to proceed farther, because of the dangers of the river, and the closing of navigation, it would not be a variation, but on the contrary, as rather supporting it; for the bill of lading excepts the unavoidable dangers of the river, and reserves the 'usual privileges,' which is admitted to be the privilege of storing, when by reason of unavoidable danger from ice, the farther prosecution of the voyage is impracticable."

The only testimony upon which the twelfth instruction is based, is that by the master, as follows : " We (plaintiff and himself) both thought it might very likely happen that the Berlin would not be able to reach St. Paul.   West said, ' If you can't get through, you can get part through.'   When the boat started, West ran to the river bank, and said, ' If you can't get through, try and get to Charley Reed's, and deliver the goods there.   He is the best man.' "   If the charge of the court contained no more than is involved in the contract itself, we should not be inclined to reverse the judgment, because the court placed it upon the additional testimony ; although it would be inadmissible, if it were independent matter.   Now what is the law of the contract, in regard to the matter of these instructions ?   All contracts are to be viewed and construed with a reference to the nature and subject matter, and to the contingencies to which they are naturally subject.   So with that before us.   Such as this, are subject to the interruption of navigation.   This enters into the contract, or it may properly enough be called the act of the Higher Power.   Thus, a boat, taking freight in November, to carry from Dubuque to St. Paul, is bound to transport it to that place ; but it is not *necessarily* bound to carry it there, during the *same season*.   If the navigation becomes

*impracticable* in consequence of the cold, the storms, or the ice of the season, the boat is excused from *then* fulfilling the contract, either on the ground of the act of the Higher Power, or because of the nature of the contract, and the contingencies which may well come within the contemplation and foresight of the parties, or his view of the clause excepting the unavoidable dangers of the river. This latter, the clause in the contract, probably has primary reference to the safety of the goods, but may it not extend also to the *performance* of the contract?

But in the present case, it is immaterial which of these views we adopt. Under one or the other, the boat had a right to stop and turn about, *if the voyage became impracticable*. What, then, was it the duty of the master to do with the goods? should he store them, or should he bring them back to Dubuque? This question is not made in the case. The action is not brought upon this point. It is not because he should have delivered them back at Dubuque, rather than store them at "Reed's," but it is because they were *not* delivered at St. Paul. Too much is made in the charge, of this matter of storing at Reed's. It is made a *point* in this twelfth instruction. If the voyage was *impracticable*, then the master had a right either to store or to bring back; and there is no complaint made, that he did not return the goods to Dubuque. If what was said were to be viewed as varying the contract at all, or as changing the liability of the boat, we should consider it inadmissible. But we view it in the light of only directing *with whom* to store, if he was obliged to stop. We regard the instruction as containing nothing in substance but what pertains to the contract itself, that is, to the bill of lading. But the instruction lays too much stress upon the testimony, *as if* it were adding new matter. Yet we do not think this sufficient cause for a reversal.

The action is instituted, and damages are sought for *not carrying the goods to St. Paul*, and the only substantial question is, whether any sufficient reason is shown for not performing the contract? The instruction numbered fourteen, bears upon this question. It is this, " If at the time the goods

were shipped, the plaintiff knew the character and capacity of the Berlin, and that it was necessary for her, in order to carry this freight, to tow it in flat boats, and that she could run only in daylight, it would be your duty to consider that the contract was entered into by both parties in reference to these things; and the plaintiff can only demand that the boat should make such speed as such a boat could reasonably make, and encounter only such obstacles and risks as she could encounter with safety. The question is not, what could a better and larger boat have done, but what could this boat have done, with due diligence? and this will refer not only to the time when the goods were stored, but to any subsequent time during the season. In the opinion of this court, the question is rather, *what did the master undertake?* The above direction, *as a rule*, would not operate safely. It is for the master to know whether he has a competent boat, and one competently equipped. Over these things, the shipper has no control. A common carrier by land, may have a sorry team, or a poor railway, or an insufficient engine, and the shipper may know it; but he is not chargeable with that knowledge, so as to lessen the duty of the carrier. The master of the boat made his contract, as any other boat does; he charges according to the season and the state of navigation. When he contracts to transport goods from St. Louis to Dubuque, the shipper knows that he has two rapids to pass over; but the master charges a price accordingly, and would not be freed from responsibility on account of the shipper's knowledge, but inserts a clause in his contract to cover the danger. In this case, he says, West offered a large price, and he appears to have contracted for a large price. We think this instruction should not have been given.

The plaintiff requested the court to charge the jury: *First.* That it was the duty of the defendant to have a boat staunch, strong, and fit for the business of transporting freight from Dubuque to St. Paul, at the season of the year when the contract was entered into. *Second.* That it was the duty of defendant to have officers, engineers, and crew, sufficient in number and competency, to run the boat constantly day and

night. These instructions should have been given. Being given, they would not mean that he must have such a boat and equipment, as could run in spite of *all* obstacles, but as much; and at such times, as boats usually do, and subject to the same contingencies of navigation.

In the foregoing remarks, it is not intended to imply, that all boats are to be tested by one inflexible criterion as to capacity. They are to be tried by their *contract*, and it is intended that when a boat makes a contract in the usual terms of other boats, it cannot excuse itself from performance, by showing that it is a poor boat or badly equipped. The question in this case is, whether this boat was justified in abandoning the trip, and in not sending the goods on? And under this, whether she was fairly capable; whether she was properly equipped in officers, men, and materials; whether she waited at Reed's Landing as long as she should, to make the attempt; whether she could not get the goods through without the flats, or could not have forwarded them, &c.?

The plaintiff requested the court to give the following instructions: "The good order in which the defendant admits, by the bill of lading, the goods were received, refers only to the external condition, and not to the state of the pork itself in reference to its soundness." This was refused. A similar question might be answered differently, when applied to different kind of goods, or when applied to goods requiring different modes of packing, or admitting of different conditions in transportation. But the master cannot be held for the quality or soundness, (when shipped), of goods, packed like this *pork in the barrel*. He is not an inspector. This instruction should have been given. There was no exception taken to the fifteenth instruction. The judgment of the court is reversed, and it is directed to proceed in accordance with this opinion.